FILED

19 DEC 23 PM 1:09

U.S. MAGISTRATE JUDGE

BY_____



# SEALED

Office of the United States Attorney
District of Nevada
501 Las Vegas Boulevard South,
Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336

FILED

19 DEC 23 PM 1:09

U.S. MAGISTRATE JUDGE

BY:_____

NICHOLAS A. TRUTANICH
United States Attorney
Nevada Bar Number 13644
District of Nevada
Rachel L. Kent
Special Assistant United States Attorney
501 Las Vegas Boulevard South, Suite 1100
Las Vegas, Nevada 89101
Phone: (702) 388-6336
Fax: (702) 388-6418
rachel.kent@usdoj.gov

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| UNITED STATES OF AMERICA, | Case No. 2:19-MJ-00964-EJY |
|---|---|
| Plaintiff, | COMPLAINT FOR VIOLATION OF: |
| v. | Title 18, United States Code, Section 1038 – False Information and Hoax Related to Purported Biological and Chemical Weapons |
| PHUONG TANG, | |
| Defendant. | |

BEFORE the United States Magistrate Judge, Las Vegas, Nevada, the undersigned complainant, being first duly sworn, deposes and states:

### Count One
### (18 U.S.C. § 1038 — False Information and Hoax Related to Purported Biological and Chemical Weapon)

On or about July 12, 2019, in the State and District of Nevada,

PHUONG TANG,

defendant, did intentionally convey false and misleading information, namely placing envelopes containing white powder, under circumstances where such information may reasonably have been believed, that indicated that an activity had taken, was taking, and would take place that would constitute a violation of Title 18, United States Code, Section 175(a) - Transfer of a Biological Agent or Toxin for Use as a Weapon, and Title 18, United

1

States Code, Section 229(a) – Chemical Weapons, to wit: defendant knowingly placed two envelopes containing a white powdery substance on the desks of two United States Department of Veterans Affairs employees at the VA Southern Nevada Healthcare System intending to convey the false and misleading information that the powder contained a biological agent and toxin and chemical weapon, all in violation of Title 18, United States Code, Section 1038(a)(1)(A).

Complainant, as and for probable cause, states the following:

1. Complainant is a Special Agent with the Department of Veterans Affairs Office of Inspector General, Criminal Investigations Division, Las Vegas Resident Agency, Las Vegas, Nevada, and has been employed as a law enforcement officer for over 19 years.

2. The following information is the result of either complainant's own personal investigation or has been provided by other law enforcement officers:

   (a) On July 12, 2019, Department of Veterans Affairs Office of Inspector General Special Agent Branton Blount was contacted by Department of Veterans Affairs Police Department Chief Reginald Winbush who stated that two envelopes containing an unknown white powdery substance were discovered in the podiatry department of the VA Southern Nevada Healthcare System that morning by three U.S. Department of Veterans Affairs employees. The three employees who came in close proximity to the envelopes and white powder, Lara Laak, Jillian Zalneraitis, and Adriane Tealer, were quarantined in an adjacent office while local police, fire, and HAZMAT authorities responded, initiating biohazard protocols.

   (b) Special Agent Blount arrived at the VA Southern Nevada Healthcare System and made contact with Chief Winbush. The North Las Vegas Police Department and Las Vegas Metropolitan Police Department, ARMOR Task Force, and Counter-

Terrorism teams had already evacuated the areas around the podiatry clinic and made entry to the office spaces containing the envelopes and white powder. The envelopes were white, outgoing VA correspondence envelopes. Special Agent Blount made contact with ARMOR Detective Brian Godkin who stated that presumptive testing determined the white powder tested positive for sodium bicarbonate (baking soda) and ammonium carbonate (smelling salts) and was deemed to be non-hazardous. The North Las Vegas Police Department Crime Scene Investigations team photographed the scene once it was determined to be safe. The evacuation and partial work stoppage of the VA Southern Nevada Healthcare System lasted approximately six hours.

(c) Evacuated employees were relocated to the auditorium, where responding officers conducted initial interviews. VA Intermediate Health Technician PHUONG TANG, who worked in the podiatry clinic, was identified as a potential suspect. According to initial reports from employees, TANG was disgruntled with the VA and his managers.

(d) TANG provided North Las Vegas Police Department and Las Vegas Metropolitan Police Department consent to search his vehicle, located in the VA Southern Nevada Healthcare System parking lot. White powder residue was present and visible on the exterior of the trunk of TANG's vehicle, a blue BMW M2, Nevada Disabled Veteran license plate E561. Further examination of TANG's vehicle showed white powder residue throughout the vehicle compartment, most prevalent in the driver side area including the gear shifter, steering wheel, seats, and seatbelt. The vehicle was searched, processed, and photographed by the North Las Vegas Police Department Crime Scene Investigations team. North Las Vegas Police Department Crime Scene Investigations team collected trace material from various locations within TANG's vehicle using adhesive tape. Physical

3

evidence collected at the scene was maintained by North Las Vegas Police Department Crime Scene Investigations team.

(e) TANG was interviewed by Detective Godkin, Officer Sam Enriquez, and Special Agent Gregory Fitzgerald as the processing of the vehicle concluded. The interview was audio recorded by Detective Godkin and later transcribed. During the interview, TANG denied any involvement with the envelopes and white powder in the podiatry clinic. Furthermore, TANG said the white residue throughout his vehicle was a result of his excessively dry skin that comes off on things he touched. TANG then said the white residue in his vehicle was chalk dust from chalk art that he did as a hobby. TANG said he did not come to the VA Southern Nevada Healthcare System between the time he left work on Thursday, July 11, 2019, and when he arrived at work that morning, July 12, 2019.

(f) On July 16, 2019, Special Agents Fitzgerald and Blount interviewed VA Health Technician Richard Carroll regarding the July 12, 2019 incident. Carroll stated that when he arrived at the VA Southern Nevada Healthcare System, the entire floor had been evacuated and everyone was told to remain in the auditorium. At the request of the VAPD, Carroll left the auditorium to assist in locating TANG's vehicle, a blue BMW M2. Carroll located TANG's vehicle and reported its location to the VAPD before returning to the auditorium. Carroll said he had an interaction with TANG on Thursday, July 11, 2019, that made him wonder about the timing of the white powder incident. TANG came into Carroll's office on July 11 to express concern about a meeting with management scheduled for the following day, July 12. TANG said to Carroll, "I just need a Marine to watch my back." Carroll said he was uncomfortable with this and told TANG to talk to another employee in the office that was a former Marine. TANG was clearly upset at Carroll for his response.

(g) On July 16, 2019, Special Agents Fitzgerald and Blount interviewed VA Health Technician Adriane Tealer. Tealer left work on Thursday, July 11, 2019, at approximately 3:45 PM. She did not notice anything or anyone out of the ordinary when she departed. Tealer was the first to arrive at the podiatry clinic on Friday morning, July 12, and saw an envelope on her desk with the word "Fong" written on it. Tealer noticed what appeared to be white powder under the envelope. Tealer immediately thought there would be an envelope on Carroll's desk as well, due to a situation that had arisen the day prior between TANG and Carroll. Tealer looked in Carroll's office and saw a similar white envelope on Carroll's desk with the letter "R" written on it. Tealer immediately left the podiatry clinic hallway and reported the situation to a supervisor, Jillian Zalneraitis, who was in her office in the adjacent hallway. Tealer knew TANG had repeated issues with various employees and managers in the podiatry department and was disgruntled. Tealer had mentioned to her supervisor, Laak, that TANG was frequently gone from his workspace for extended periods of time. Earlier that same week, supervisors Zalneraitis and Laak spoke to TANG regarding his time and attendance. Afterward, TANG had said to Tealer, "Someone ratted me out." Tealer was afraid that TANG somehow knew it had been her that reported him for being absent. Tealer described TANG as being quite odd. Tealer overheard TANG talking about killing his neighbor's pets, getting in fights, and selling drugs back when he was in the Navy. TANG had also made comments such as "I'm schizophrenic. If I don't take my medication, I can beat people." Tealer heard that a few weeks prior to the July 12 incident, TANG made a comment to a health technician from orthopedics about how it would be funny if envelopes with baking soda were left in the clinic.

(h) On July 16, 2019, Special Agents Fitzgerald and Blount interviewed VA Orthopedic Health Technician Tesha Seawell. Seawell described TANG as having

5

tendencies and a demeanor that "gave her chills." Seawell recalled a conversation in the breakroom between TANG and Tealer in which TANG, completely unprompted, said "I torture cats. I caught one and tied it up with a string." This was not the first time TANG made disturbing comments like this to co-workers. Seawell stated that on approximately July 5, 2019, she and TANG were in the breakroom at lunch time and TANG said, "Wouldn't it be funny if someone sent white powder in the mail or put it on the floor in the clinics because we would get the day off?" Seawell asked TANG what he meant, to which TANG replied, "Just wait." When Seawell heard about the nature of the incident on July 12, she immediately reported TANG's prior statements to her supervisor. Seawell said that TANG's overall demeanor and apparent willingness to act on his prior statements made her feel unsafe, both at work and at home.

    (i) On August 1, 2019, Special Agent Blount interviewed VA Associate Nurse Executive, Eric Lord. Lord stated on the morning of July 12, 2019, he received an "emergency" text from Laak, a supervisor in podiatry. Lord immediately called Laak and learned that Tealer discovered two envelopes containing an unknown white powder in the podiatry clinic. The VAPD had already quarantined Laak, Zalneraitis, and Tealer, and evacuated the area when Lord arrived at the VA Southern Nevada Healthcare System. Lord said that he had scheduled a meeting later that day with TANG to discuss time and attendance issues; that meeting, however, did not take place due to the white powder incident. Lord only knew TANG by name prior to July 12, 2019. He had been made aware of several peripheral issues TANG was having in the work place. Additionally, Lord received a copy of a complaint, submitted by TANG to the White House in Washington, D.C., regarding issues TANG was having with his healthcare through the VA.

(j) On August 1, 2019, Special Agent Blount interviewed VA Assistant Nurse Manager Zalneraitis. Zalneraitis stated she arrived at work at about 6:00 AM on July 12, 2019. Zalneraitis unlocked her office and was getting ready for the day when Tealer came in to her office and said, "We have a situation". Tealer told Zalneraitis about the two envelopes and white powder she had just discovered. Zalneraitis asked Tealer if she had touched either of the envelopes. Tealer said she had touched the envelopes before she noticed the white powder. Zalneraitis immediately contacted the VAPD to report the situation. Zalneraitis then went down the podiatry hallway with Tealer where she saw the envelopes on Tealer and Carroll's desks. Zalneraitis texted Laak to let her know about the situation. Laak arrived shortly thereafter. Once the VAPD officers arrived, Zalneraitis, Tealer, and Laak were quarantined in an adjoining office for several hours. Zalneraitis and Laak had met with TANG on Monday, July 8, 2019, to discuss his time and attendance issues. There were several reports from employees regarding TANG's absence from work for extended periods of time throughout the day. Zalneraitis described the July 8 meeting as a "casual explanation of the policies related to time and attendance." During this meeting, TANG continued to say that he did not understand the issue and that he wanted to know who his accuser was. Zalneraitis and Laak had no other way to explain the policy to TANG, so Laak told TANG she would schedule a follow up meeting later in the week with human resources, union representatives, and their next level supervisor, Lord. The meeting was scheduled for the next day, July 9. Shortly after the initial meeting, TANG submitted leave for July 9. The meeting was then rescheduled for 2:30 PM, Friday, July 12, 2019. Zalneraitis' main concern was for her own safety and that of the employees at the VA Southern Nevada Healthcare System. TANG had a history of disturbing comments about torturing animals, getting in fights, and a generally violent attitude. TANG also mentioned guns and shooting, which

7

made Zalneraitis seriously concerned that, with everything going on, TANG could come in to the VA Southern Nevada Healthcare System and shoot people.

       (k)    On August 1, 2019, Special Agent Blount interviewed VA Assistant Nurse Manager Laak. Laak stated when she arrived at work on July 12, 2019, Zalneraitis was already on the phone with the VAPD. Once off the phone, Zalneraitis showed the envelopes to Laak. Officers arrived and quarantined Laak, Zalneraitis, and Tealer in an adjoining office, where they remained for several hours. Laak's first thought when she saw the envelopes and white powder was that TANG was responsible. She, along with others in the department, were constantly worried about what TANG was capable of. About a week prior to the July 12 incident, Laak received a report from Tealer stating TANG was again absent from work for more than 30 minutes without any leave in the system. TANG's frequent absences were causing work flow issues in the clinic. In response to this attendance issues, and previous reports leading up to that incident, Laak scheduled a meeting with TANG and Zalneraitis on July 8 to discuss time and attendance. During this meeting TANG insisted he did not understand the issue and was adamant that he was being singled out. Laak decided to get more people involved to assist in resolving the issue. Laak scheduled a meeting for the following day; TANG, however, immediately submitted leave. Laak then rescheduled the meeting for the afternoon of Friday, July 12, 2019. Shortly after the July 8 meeting, word circulated back to Laak from employees that TANG was furious at Laak. Laak was extremely concerned about what TANG may do, so much so that she changed where she parked at work and no longer kept her food in the employee refrigerator.

       (l)    On September 13, 2019, Special Agent Blount received North Las Vegas Police Department Crime Scene Investigations' report of fingerprint analysis. A match was identified between two latent prints located on one of the envelopes containing the white

powder discovered in the VA Southern Nevada Healthcare System podiatry department on July 12, 2019, and TANG's right middle finger and left index finger.

(m) On October 9, 2019, ARMOR Detectives Brian Godkin and Patrick Halligan, and Special Agent Blount interviewed TANG in the VA Police Department conference room. VA Union Stewards Robert Olson and Robinah Nakimera were also present for the interview. TANG was provided an Advisement of Rights – *Garrity* form, which he acknowledged and signed. The interview was audio recorded and later transcribed. TANG said he left work on Thursday, July 11, 2019, and did not return to the VA Southern Nevada Healthcare System until his scheduled shift the following morning, Friday, July 12, 2019. The police were at the podiatry clinic and had roped off the area when TANG arrived. TANG said he did not know what was going on. TANG stated he never saw the envelopes because he was not admitted to the area. TANG stated white correspondence envelopes were kept in the front administrative office. TANG said he used only larger manila envelopes for intradepartmental correspondence, and he never used the white envelopes kept in the administrative office. When asked why his fingerprints were found on the envelopes containing the white powder, TANG first claimed he touched many things when in the administrative office due to his poor vision. When asked again about his fingerprints, combined with the white powder found in his vehicle, TANG confessed to having come into the podiatry clinic overnight at approximately 1:00 AM, and putting the envelopes containing the white powder on his two coworkers' desks. TANG explained that the white powder was baking soda, which he found in a neighbor's trash. When asked why he left the envelopes and white powder in the podiatry clinic, TANG said he had a voice in his head that told him to do things.

///

TANG also stated he was having trouble and no one at work would listen to him.

_____
GREGORY FITZGERALD, Special Agent
Department of Veterans Affairs
Office of Inspector General

SUBSCRIBED and SWORN to before me this 23 day of December, 2019.

_____
HONORABLE ELAYNA J. YOUCHAH
UNITED STATES MAGISTRATE JUDGE